# FAR EAST CONFERENCE ET AL. *v.*
## UNITED STATES ET AL.

No. 15, Misc.  Argued January 30, 1952.—Decided March 10, 1952.

*Elkan Turk* argued the cause for the Far East Conference et al., petitioners. With him on the brief were *John Milton* and *Seymour H. Kligler*.

*John W. Davis* argued the cause for the Isthmian Steamship Co., petitioner. With him on the brief was *Josiah Stryker*.

*J. Roger Wollenberg* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Assistant Attorney General Morison*.

*Arthur M. Boal* argued the cause for the Federal Maritime Board, respondent. With him on the brief were *Francis S. Walker* and *George F. Galland*.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is a suit in the District Court for New Jersey to enjoin violations of the Sherman Law.[1] 26 Stat. 209, 15 U. S. C. §§ 1 and 2. The defendants were the Far East Conference, a voluntary association, and its constituent members, steamship companies engaged in what is known as the "outbound Far East trade." The Conference was organized in 1922, and the Conference Agreement under which it operates was approved by the United States Shipping Board,[2] exercising authority under the Shipping

---

[1] The jurisdiction of the District Court was based on § 4 of the Sherman Law: "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 of this title . . ." 26 Stat. 209, 15 U. S. C. § 4.

[2] Section 3 of the Shipping Act of 1916 created the Shipping Board. 39 Stat. 728, 729. Through several steps its functions have come to its present successor, the Federal Maritime Board. By Executive Order No. 6166, June 10, 1933, § 12, its functions were transferred to the United States Shipping Board Bureau in the Department of Commerce. In 1936 Congress created the United States Maritime Commission, 49 Stat. 1985, 1987, 46 U. S. C. § 1114; and in 1950 the present Federal Maritime Board was established. Reorganization Plan No. 21 of 1950, 15 Fed. Reg. 3178–3180.

Act of 1916, as amended.[3]   Under this Agreement there has been established a dual system of rates, called the contract and noncontract rate system.[4]   Shippers who agreed to use exclusively bottoms of Conference members paid one rate; those who did not bind themselves by such exclusive patronage contract paid a fixed higher rate.   Shippers who adhered to the exclusive patronage contract were not tied to a particular carrier; they were free to choose among Conference carriers.   The Conference members, however, were obligated to supply facilities sufficient to handle freight destined for the Far East.   This system of two levels of freight rates constituted the gravamen of the Government's suit.

Admitting the dual-rate system, the defendants justified on the merits but moved that the complaint be dismissed on the ground that the nature of the issues required that resort must first be had to the Federal Maritime Board before a District Court could adjudicate the Government's complaint.   The Board, as intervenor, joined in this motion.   It was denied by the District Court, 94 F. Supp. 900, and we brought the case here, under § 262 of the Judicial Code, 28 U. S. C. § 1651 (a), because there are in issue important questions regarding the relation between the Sherman Law and the Shipping Act.   342 U. S. 811.

---

[3] 39 Stat. 728, 46 U. S. C. § 801 *et seq.*

[4] The irrelevance of the failure to file the rates themselves with the Board was laid bare in *United States Navigation Co.* v. *Cunard Steamship Co.*, 284 U. S. 474, 486–487:

"If there be a failure to file an agreement as required by § 15, the board, as in the case of other violations of the act, is fully authorized by § 22, *supra*, to afford relief upon complaint or upon its own motion.   Its orders, in that respect, as in other respects, are then, under §.31, for the first time, open to a judicial proceeding to enforce, suspend or set them aside in accordance, generally, with the rules and limitations announced by this court in respect of like orders made by the Interstate Commerce Commission."

At the threshold we must decide whether, in a suit brought by the United States to enjoin a dual-rate system enforced in concert by steamship carriers engaged in foreign trade, a District Court can pass on the merits of the complaint before the Federal Maritime Board has passed upon the question. We see no reason to depart from *United States Navigation Co.* v. *Cunard Steamship Co.,* 284 U. S. 474. That case answers our problem. There a competing carrier invoked the Antitrust Acts for an injunction against a combination of carriers in the North Atlantic trade which were alleged to operate a dual-rate system similar to that here involved. The plaintiff had not previously challenged the offending practice before the United States Shipping Board, the predecessor in authority of the present Maritime Board. This Court sustained the two lower courts, 39 F. 2d 204 (D. C. S. D. N. Y.) and 50 F. 2d 83 (C. A. 2d Cir.), dismissing the bill because initial consideration by the Shipping Board of the circumstances in controversy had not been sought. After a detailed analysis of the provisions of the Shipping Act and their relation to the construction theretofore given to the Interstate Commerce Act, this was the conclusion:

"The [Shipping] act is restrictive in its operation upon some of the activities of common carriers by water, and permissive in respect of others. Their business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge. Whether a given agreement among such carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well under-

stood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade; and with which that body, consequently, is better able to deal. Compare *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238; *United States* v. *Hamburgh-American S. S. Line*, 216 Fed. 971.

"A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, without going into detail, that the allegations either constitute direct and basic charges of violations of these provisions or are so interrelated with such charges as to be in effect a component part of them; and the remedy is that afforded by the Shipping Act, which to that extent supersedes the antitrust laws. Compare *Keogh* v. *Chicago & N. W. Ry. Co.*, *supra* [260 U. S. 156], at p. 162. The matter, therefore, is within the exclusive preliminary jurisdiction of the Shipping Board. The scope and evident purpose of the Shipping Act, as in the case of the Interstate Commerce Act, are demonstrative of this conclusion." 284 U. S. 474, 485.

The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for as-

certaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

It is significant that this mode of accommodating the complementary roles of courts and administrative agencies in the enforcement of law was originally applied in a situation where the face of the statute gave the Interstate Commerce Commission and the courts concurrent jurisdiction. "The pioneer work of Chief Justice White" in *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, as his successor characterized it, 257 U. S. xxvi, was one of those creative judicial labors whereby modern administrative law is being developed as part of our traditional system of law. In this case we are merely applying the philosophy which was put in memorable words by Mr. Justice (as he then was) Stone:

> ". . . court and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through coördinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim." *United States* v. *Morgan*, 307 U. S. 183, 191.

The sole distinction between the *Cunard* case and this is that there a private shipper invoked the Antitrust Acts and here it is the Government. This difference, does not touch the factors that determined the *Cunard* case. The same considerations of administrative expertise apply, whoever initiates the action. The same Antitrust Laws and the same Shipping Act apply to the same dual-rate system. To the same extent they define the appropriate orbits of action as between court and Maritime Board.

But the Government argues that it should not be forced to go first to the Board because the United States may not be deemed a "person" who under § 22 of the Shipping Act may file a complaint with the Maritime Board.[5] Surely the large question here in issue ought not to turn on such a debating point. It is almost frivolous to suggest that the Maritime Board would deny standing to the United States as a complainant. The Board has consistently treated the United States as a "person" within its rule for intervention. We ought not to dally longer with this objection, considering the fact that the United States, as a matter of common knowledge, is today one of the largest shippers in the Far East trade. The matter seems to be disposed of by *United States* v. *Interstate Commerce Commission*, 337 U. S. 426, 430 *et seq.*, involving similar provisions of the Interstate Commerce Act.

Having concluded that initial submission to the Federal Maritime Board is required, we may either order the case retained on the District Court docket pending the Board's action, *General American Tank Car Corp.* v. *El Dorado Terminal Co.*, 308 U. S. 422, 432–433; *El Dorado Oil Works* v. *United States*, 328 U. S. 12, 17; see *United States* v. *Interstate Commerce Commission, supra,* at 465, n. 12, or order dismissal of the proceeding brought in the Dis-

---

[5] 39 Stat. 728, 736, 46 U. S. C. § 821.

trict Court. As distinguished from the situation presented by the first *El Dorado* case, *supra,* which was a contract action raising only incidentally a question proper for initial administrative decision, the present case involves questions within the general scope of the Maritime Board's jurisdiction. Shipping Act of 1916, §§ 14, 15, 39 Stat. 728, 733, 46 U. S. C. §§ 812, 814. An order of the Board will be subject to review by a United States Court of Appeals, with opportunity for further review in this Court on writ of certiorari. Pub. L. No. 901, 81st Cong., 2d Sess., §§ 2, 10, 64 Stat. 1129, 1132. If the Board's order is favorable to the United States, it can be enforced by process of the District Court on the Attorney General's application. 39 Stat. 728, 737, 46 U. S. C. § 828. We believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate. Business-like procedure counsels that the Government's complaint should now be dismissed, as was the complaint in *United States Navigation Co.* v. *Cunard Steamship Co., supra.*

The judgment of the District Court must be

*Reversed.*

Mr. Justice Clark took no part in the consideration or decision of this case.

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

The Shipping Act would have to be amended for me to reach the result of the majority. The Conference agreement, approved by the Board in 1922, provides for the adoption by the Conference of a tariff of rates and charges.

It states that there shall be no unjust discrimination against shippers and no rebates paid to them. There is no provision in the agreement for dual rates—no arrangement for allowing one rate to shippers who give all their business to the members and for retaliations against non-subscribing shippers by exacting from them a higher rate. Nevertheless petitioners have prescribed this dual rate system for the purpose of barring from the outbound Far East trade steamship lines that are not members of the combination. At least these are the facts if we are to believe the allegations of the complaint, as we must on the motion to dismiss.

If the Board had expressly approved the dual rate system, and the dual rate system did not violate the Shipping Act, then there would be immunity from the Sherman Act, since § 15 of the Shipping Act, 39 Stat. 733, as amended, 46 U. S. C. § 814, gives the Board authority to approve agreements fixing or regulating rates, in effect makes "lawful" the rates so approved, and exempts from the Sherman Act every "lawful" agreement concerning them. But that exemption from the Sherman Act can be acquired only in the manner prescribed by § 15. Here no effort was made to obtain it. Hence the petitioners are at large, subject to all of the restraints of the Sherman Act.

Why should the Department of Justice be remitted to the Board for its remedy? The Board has no authority to enforce the Sherman Act.[1] If the rates were filed, of course the Board would have exclusive jurisdiction to pass on them. But even then it is restricted. Section 14, Third, for example, makes unlawful retaliation against any shipper by resort to discriminatory or unfair tactics because a shipper has patronized another carrier. And it

---

[1] The remedy provided by § 22 of the Shipping Act is for "any violation of this Act." The charge in the present case is a violation of the Sherman Act.

would seem plain that when a shipper is charged one rate if he gives the Conference a monopoly of his business and another and higher rate if the shipper uses a carrier not a member of the Conference, the shipper is being retaliated against for shopping around among carriers.

Petitioners, therefore, operate outside the law not only because they have failed to submit their schedule of rates to the Board but also because the rates adopted would, if approved, be illegal.[2] The steamship companies, therefore, flout the law as plainly as if they used rates that had been disapproved by the Board. In either case the public interest needs protection if the Sherman Act is to be enforced—whether it be represented in a criminal prosecution or, as here, in a civil proceeding brought by the United States.

The jurisdiction of the Department of Justice must commence at this point, unless we are to amend the Act by granting an anti-trust exemption to rate fixing not only when the rates are filed by the companies and approved by the Board but also when they are not filed at all or are rates which, if filed, could not be approved. I would read the Act as written and require the steamship companies to obtain the anti-trust exemption in the precise way Congress has provided.

---

[2] There is less room for expertise where the rates used by the steamship companies are unfiled rates or unlawful rates. Cf. *U. S. Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474.